**AL–SITE CORP., Plaintiff,**

v.

**OPTI–RAY, INC., Defendant.**

No. CV–92–4205.

United States District Court,
E.D. New York.

Aug. 31, 1993.

Peter T. Cobrin, Cobrin, Gittes & Samuel, New York City, for plaintiff.

William F. Dudine, Jr., Darby & Darby, New York City, for defendant.

## MEMORANDUM AND ORDER

GLASSER, District Judge.

Plaintiff Al–Site Corp. ("Al–Site") commenced this patent infringement action against defendant Opti–Ray, Inc. ("Opti–Ray"), alleging that Opti–Ray was a direct and contributory infringer of Al–Site's patented hanger mechanism for displaying eyeglasses, U.S. Patent No. 5,144,345 (the " '345 patent"). This case was initially randomly assigned to Judge Arthur D. Spatt, but was reassigned to this Court as related to *Al–Site Corp. v. Opti–Ray, Inc.*, No. CV–91–1770 (ILG). The first action involved an earlier version of the '345 patent: U.S. Patent No. 4,976,532 (the " '532 patent").

On February 1, 1993, Al–Site moved this Court for a preliminary injunction or, in the alternative, for an expedited trial solely on the issue of patent infringement of the '345 patent.[1] This Court scheduled an expedited trial for February 16, 1993, mooting plaintiff's request for preliminary injunctive relief. Tr. of Feb. 1, 1993 Hrng. at 2–4. A three-day bench trial was subsequently held on February 16, 17, 18, 1993.[2] In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, this Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

*Plaintiff Al–Site*

Al–Site is a Delaware Corporation which manufactures, markets and distributes magnification products, including non-prescription reading glasses, hand-held magnifying glasses and associated accessories. Tr. 140. Al–Site markets its reading glasses under the trade name "Magnivision." PX3, PX4, PX6. Reading glasses are similar to standard eyeglasses but are sold over-the-counter without a prescription. Presently, all fifty states allow over-the-counter sales of reading glasses. Tr. 162. Reading glasses, like standard eyeglasses, are comprised of two lenses for magnification and an eyeglass frame. The eyeglass frame includes two eyeglass rims surrounding the lenses, a nose bridge to connect those rims, and two eyeglass temples perpendicular to the rest of the eyeglass frame to be placed on the ears of the wearer.

Traditionally, reading glasses were displayed either by placing the eyeglass temples through holes cut into a display case or by folding the temples and placing a single pair of glasses in a cubbyhole or on a hook. Tr. 170; PX3; Tr. of Deposition of Jerome Berliner, dated December 31, 1992, at 23–24. A customer could then choose a pair of glasses at random, try it on and attempt to read an eyesight chart approximately 14 inches away. If the magnification power was satisfactory, the customer could purchase the glasses. Tr. 140–41. However, this individual-stacking system stultified growth of the over-the-counter reading glasses market because a customer could only purchase one pair of glasses of the desired magnification strength at a time. In addition, once a pair of glasses was purchased, another customer would not be able to purchase a pair of glasses of

---

1. The parties agreed to bifurcate the trial with respect to damages and to have this Court determine at a later date, if necessary, the appropriate amount of damages to award Al–Site and whether Opti–Ray's infringement was willful. Tr. of Bench Trial at 7–8 (hereinafter "Tr.").

2. The parties originally requested a jury trial, but thereafter consented to a bench trial.

similar magnification strength until the retailer re-stocked the cubbyhole or the hook. Tr. 142–43, 145.

To solve this marketing problem, Al–Site initially attempted to stack multiple pairs of glasses on a display stand by placing the glasses in plastic packs or blister packs and hanging them from a cantilever. A plastic tray, adjacent to the display stand, contained six sample pairs of eyeglasses, which were attached to the tray with a chain. A consumer could try on a sample by lifting it off the tray until the chain was taut. *See* PX4. Once the desired magnification strength was discovered, the consumer could select one or more pairs of glasses from the array of blister packs. However, customers were averse to purchasing glasses in blister packs which could not be tried on beforehand. Tr. 146–147.

To correct the limitations of these earlier marketing systems, Al–Site designed a means for hanging multiple pairs of reading glasses of the same magnification strength in a row which would enable retailers to sell multiple pairs of glasses without replenishing stock and which would allow consumers to try on each pair of glasses prior to purchase. Tr. 149–50.

On December 11, 1990, the Patent and Trademark Office ("PTO") issued the '532 patent to Al–Site for an invention entitled "Hanger for Displaying Eyeglasses." Subsequently, on September 1, 1992, the PTO issued the '345 patent to Al–Site as a continuation patent of the '532 patent. The '345 patent is identical to the '532 patent except for the claims recited therein. The patent claims of the '345 patent involve a hanger card to be affixed to a pair of reading eyeglasses. The hanger card is a flat piece of relatively stiff plastic with a means for securing it to an eyeglass frame. There is an aperture near the top of the hanger card which enables the card to be shifted along a cantilever, *i.e.*, a horizontal rod extending from a vertical display case. Once a hanger card is affixed to an eyeglass frame, the pair of glasses may be hung from the cantilever, enabling multiple pairs of glasses of the same magnification strength to be stacked and shifted along a single cantilever. In addition, the hanger card contains relevant information pertaining to the style, magnification strength and retail price of the pair of eyeglasses.

Al–Site began using and distributing the hanger card system in 1988. It has invested $3 million to develop that system, to replace existing display racks in retail stores, and to affix hanger cards to existing inventory in retail stores. Tr. 150, 168.

*Defendant Opti–Ray*

Opti–Ray is a New York corporation which markets sunglasses, clip-on sunglasses and reading glasses to retailers in the United States and Canada. Tr. 212. Opti–Ray sells some of its reading glasses under the trade name Optivision. Tr. 217. It also manufactures and distributes glasses under licenses from Mattel, Inc. and Revlon, Inc. Tr. 220–21, 227–28, 233.

The structure accused of infringing the '345 patent is a hanger card which Opti–Ray uses to display its glasses in its display racks. *See* PX11A and PX11B. Like Al–Site's hanger card, Opti–Ray's version slides along a cantilever extending from a vertical display. However, unlike Al–Site's hanger card which loops around the bridge of the eyeglass frame, Opti–Ray's hanger card is affixed to a pair of eyeglasses by inserting an eyeglass temple through a slot cut into a wide extension positioned below the Opti–Ray hanger card and then by placing two resilient stickers over the slot. Tr. 216.

*Prior Art*

*Cool Ray Catalogs and Physical Specimens*

Until 1976, American Optical Company was the exclusive licensee of a lens developed by the Polaroid Corporation (the "polaroid lens"). American Optical, through its wholly-owned subsidiary Cool Ray, produced and marketed sunglasses using the polaroid lens under the name "Cool Ray Polaroid" sunglasses. Tr. 199. In 1976, American Optical ceased to be the exclusive licensee of the polaroid lens and Cool Ray renamed its sunglasses "Cool Ray Polarized" sunglasses. Tr. 199. Cool Ray then ceased production in

1979 and went out of business in 1980. Tr. 201.

DX16, DX18 and DX80 are physical exhibits of Cool Ray sunglasses with a patented Seaver pilfer-resistant tag attached. All three of those sunglasses do not have eyeglass temples: they are simply accessories to be attached to a regular pair of eyeglasses. The Cool Ray physical specimens were identified at trial by Clifford Pontbriand, who began working for Cool Ray in 1959 and who was promoted to vice-president and director of Cool Ray around 1966–1967 and continued in that capacity until approximately 1978. Tr. 194–195. He testified that Cool Ray modified the Seaver patent by punching a hole in the pilfer-proof tag, which allowed Cool Ray products to be supported by a cantilever. Tr. 197, 205. Pontbriand also testified that the aperture could be placed above or below the bridge of the sunglasses. Tr. 205–06. His testimony was informative and credible. However, he conceded that none of the catalogs which were disseminated to the public displayed the Cool Ray tag above the bridge of the eyeglasses. Tr. 209.

DX8 through DX13 are copies of various Cool Ray catalogs. DX8 is a copy of the 1975 Cool Ray catalog and DX9 are selected pages of that catalog. DX10 is a copy of the 1976 Cool Ray catalog and DX11 are selected pages of that catalog. DX12 is a copy of the 1977 Cool Ray catalog and DX13 are selected pages of that catalog. DX14 is a 1980 Cool Ray pricing sheet which depicts four display systems for Cool Ray glasses and one display system for Cool Ray clip-on sunglasses. DX15 is a blow-up of the display rack for clip-on sunglasses and DX48 is an enhanced blow-up of that display rack. Notwithstanding the enlargement and enhancement of that picture, it is still difficult to discern exactly how the Cool Ray clip-on sunglasses were stacked on the display rack.

### Seaver Patent

PX18 is U.S. Patent No. 3,738,034, issued to Charles W. Seaver, an engineering manager at Cool Ray, for a "Spectacle for Sunglass and Information Tag Combination" (the "Seaver Patent"). That patent simply shows a means of reducing pilferage and simultaneously affixing product information to a pair of sunglasses. It does not depict a means of hanging a pair of eyeglasses on a cantilever because the information tag does not contain an aperture.

### Pacelli Patent

PX20 is U.S. Patent No. 3,116,829, issued to W.G. Pacelli, for a "Pilfer–Proof Display Package for Sunglasses" (the "Pacelli patent"). DX53 is a model of that patented invention. The Pacelli patent does not depict a loop around an eyeglass frame. Instead, it provides for a plastic package to completely surround the frame and lenses of a pair of sunglasses. Tr. 94–96, 112–13 (testimony of Dr. Michael Rosen). This is accomplished by stapling two sheets of plastic to a cardboard card. A customer is then able to pick up the package containing a pair of sunglasses and to try on the sunglasses by peering at his or her reflection in mirror through the sunglasses and the two pieces of plastic that enclose the sunglasses. Such a system is unworkable with regular eyeglasses because the plastic case would distort the magnifying strength of the lens. Tr. 71–72.

### Al–Site Display Stand

PX3 is an earlier version of an Al–Site eyeglass display case. Eyeglasses are displayed on that exhibit by folding the eyeglass temples and placing a single pair of eyeglasses on a hook. Each of the pairs of eyeglasses has a tag attached to an eyeglass temple, but the tag is not used to hang the pair of eyeglasses on the display case. Nor does this Court find that a hook constitutes a cantilever as claimed by one of Opti–Ray's expert witnesses. *See* Tr. 309 (testimony of Eugene Chovanes).

### Expert Witnesses

Dr. Michael Rosen testified on behalf of Al–Site. Dr. Rosen has an undergraduate degree in engineering from Brown University and a graduate degree in biomedical engineering from Northwestern University. He has published extensively in professional journals on many topics and has taught design methodology at MIT. Tr. 24–25. This court accepted Dr. Rosen as an expert in the fields of product design and of design methodology. Tr. 25.

Dr. Rosen testified that the appropriate level of skill in 1987 of a worker designing a new type of marketing system for non-prescription reading glasses as being a person with a very close working familiarity with his customers, with the market and with the way people behave at the point of sale and the person would have some design ability. (Tr. 27–28). This Court adopts this definition.

William Plumb testified on behalf of Opti–Ray. Mr. Plumb has an undergraduate degree in engineering/fine arts from Cornell University. This court accepted Mr. Plumb as an expert in the field of product design. Tr. 240, 246. Mr. Plumb defined the reasonable person skilled in the art as someone holding a degree in industrial design. Tr. 256. This Court rejects this definition.

Eugene Chovanes testified on behalf of Opti–Ray. Mr. Chovanes has an undergraduate degree in mechanical engineering from Lehigh University and a law degree from Villanova University School of Law. He is a patent attorney and he has been qualified as an expert in approximately forty cases and has testified in fifteen of those cases. Tr. 344. This court accepted Mr. Chovanes as an expert based on his knowledge of patent law and his degree in mechanical engineering. Tr. 272–73. Mr. Chovanes was allowed to testify regarding the factual matters underlying the interpretation of claims 1 and 2 of the '345 patent. Tr. 279–80; 309.

### CONCLUSIONS OF LAW

1. Patent Infringement

■ A determination of patent infringement involves a two-step inquiry. The court must first interpret the claims contained in the patent and then it must determine whether the claims, as construed by the court, "read on" the accused structure either literally or under the doctrine of equivalents. *Texas Instruments Inc. v. United States Int'l Trade Comm'n*, 988 F.2d 1165, 1171–72 (Fed. Cir.1993); *Snellman v. Ricoh Co., Ltd.*, 862 F.2d 283, 286 (Fed.Cir.1988), *cert. denied*, 491 U.S. 910, 109 S.Ct. 3199, 105 L.Ed.2d 707 (1989).

■ The first of these two inquiries—construction of the patent claim—is a ques-

tion of law. *Texas Instruments*, 988 F.2d at 1171; *Smithkline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 889 (Fed.Cir.1988). "Claim interpretation involves a review of the specification, the prosecution history, the claims (including [omitted] as well as asserted claims) and if necessary, other extrinsic evidence, such as expert testimony." *Texas Instruments*, 988 F.2d at 1171. Expert testimony is, however, not required to interpret non-technical language or words that have no special meaning to those skilled in the art. *Senmed, Inc. v. Richard–Allan Medical Indus., Inc.*, 888 F.2d 815, 819 n. 8 (Fed.Cir. 1989). Finally, the functional limitations of a patented invention are disclosed by the language of the claim, *Environmental Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 699 (Fed.Cir.1983) (citing *Continental Paper Bag Co. v. Eastern Paper Bag Co.*, 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122 (1908)), *cert. denied*, 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984). Thus, limitations found solely in the patent specification do not limit the patented invention. *Environmental Designs*, 713 F.2d at 699 (citing *Smith v. Snow*, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721 (1935)).

■ Applying these established principles of patent law, this Court interprets the means-plus-function language of Claim 1 of the '345 patent as requiring (1) a pair of eyeglasses comprised of two lenses and an eyeglass frame consisting of two temples, a rim surrounding each lens ("means for mounting [both lenses] in a side-by side relationship") and a nose bridge between the lenses; (2) a hanger card with an aperture ("opening means for receiving the cantilever support means"); (3) an eyeglass display with a cantilever arm ("cantilever support means"); and (4) a means for securing the hanger card to the eyeglass frame so as not to impede the eyeglass temples from being selectively opened and closed and which allows the pair of eye glasses to hang in a horizontal orientation from a cantilever and to be shifted along the cantilever. Tr. 30–39 (testimony of Dr. Rosen). Claim 2 of the '345 patent is dependent on claim 1 and merely adds that the hanger card itself may contain the means for securing the hanger card to the eyeglass frame.

Opti–Ray offered the expert testimony of Eugene Chovanes to demonstrate that claims 1 and 2 of the '345 patent contain the additional limitation that the hanger member must be firmly secured to the pair of glasses in order to reduce pilferage. (Tr. 294–95, 299). However, this Court rejects that expert testimony because neither claims 1 or 2 contain this functional limitation and because it is clear that "the primary object of the ['345 patent] was to provide a novel construction for a product display hanger." '345 Patent at Col. 2. Accomplishing this primary objective merely requires that the hanger card be attached to the eyeglass frame so as to allow the eyeglasses to be hung in a horizontal orientation from a cantilever and to be shifted along that cantilever.[3]

■ The second inquiry—comparison of the claim with the accused device—is a question of fact. *Texas Instruments*, 988 F.2d at 1172. An accused device may infringe a patent either literally or under the doctrine of equivalents. "Literal infringement requires that every limitation of the patent claim must be found in the accused device." *Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1054 (Fed.Cir.), *cert. denied*, 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988). If the plaintiff is unable to demonstrate literal infringement of a claim, the defendant may nonetheless be held liable for patent infringement under the doctrine of equivalents. This equitable doctrine renders a defendant liable for patent infringement if the accused device "performs substantially the same overall function or work, in substantially the same way, to obtain substantially the same overall result as the claimed invention." *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d

931, 934 (Fed.Cir.1987), *cert. denied*, 485 U.S. 1009, 108 S.Ct. 1474, 99 L.Ed.2d 703 (1988).

It is clear to this Court that Opti–Ray's hanger tag literally infringes the '345 patent. The expert testimony of Dr. Rosen, who testified on behalf of Al–Site, was extremely credible. Dr. Rosen testified that the Opti–Ray eyeglass display system had (1) a display case with a cantilever, Tr. 43, 45–46, 57–58; (2) a hanger member in the form of the plastic card attached to the eyeglass temple, Tr. 44; (3) a pair of eyeglasses comprised of two lenses, two rims, a nose bridge and two moveable eyeglass temples, Tr. 47–49; (4) a means for securing the hanger member to the pair of eyeglasses so that the eyeglasses hang below the hanger member, Tr. 50–51; (5) a securing means which forms a loop around the eyeglass frame since the accused structure slides over, under and back over the temple portion of the frame which constitutes a loop around the eyeglass frame, Tr. 51, 58–59 [4]; *see* PX26, PX27 and PX28 (physical specimens of three types of loops including the loop employed in the accused structure); and (6) an opening means to suspend the hanger card from the cantilever and to hold the glasses in a horizontal position below the hanger card, Tr. 54–56. This constitutes literal infringement of claim 1 of the '345 patent. Claim 2 of the '345 patent is similarly infringed because the loop portion of the accused structure is an integral part of the hanger card.

This Court agrees with Dr. Rosen that the means for securing element of claim 1 and dependent claim 2 of the '345 patent may be secured to any part of the eyeglass frame: it can be attached to the bridge or temple of the eyeglass frame. Tr. 39–40. This Court

---

3. In either event, this Court discredits the testimony of Chovanes that Opti–Ray's hanger card "simply slid off" the eyeglass temple and did not perform the means-for-securing function of the '345 patent. Tr. 299–300, 302, 304. This Court has examined a few pairs of reading glasses with an attached Opti–Ray hang tag (e.g., PX9) and finds that the two self-adhesive fasteners that secure the hanger card to the eyeglass temple would meet the means-for-securing limitation proposed by Chovanes as it is nearly impossible to slide the accused structure off the eyeglass temple without first removing both of the self-adhesive fasteners. *See* Tr. 329–30 (Chovanes testified on cross that one must remove plastic

adhesive before the Opti–Ray tag can be removed); Tr. at 20 (Dudine Opening Statement) ("... the accused's product has a stick-on label there, and what the customer does when he or she takes it home is simply peels the label off, and once the label is off it slides right off."); Tr. 235 (Peckman testifies that you must first remove the label before the Opti–Ray tag can be removed).

4. Chovanes did not consider the temple cutout slots as a loop. Tr. 302. He disagreed with Dr. Rosen's testimony. Tr. 304–05.

rejects Chovanes' testimony that the Opti–Ray hanger card does not infringe the '345 patent because Opti–Ray's version does not contain an extension to loop around the nose bridge. Tr. 302. The prosecution history makes it readily apparent that the means for securing element of the '345 patent was not limited to being attached to the bridge. *See, e.g.,* Patent Application 606179 at 69 (Remarks of Peter Cobrin, Al–Site's new patent counsel, in support of patent application) ("the fact that the eyeglasses are hung from a cantilever support in a horizontal manner forms part of the essence of the present invention, regardless of the exact manner of securing the eyeglasses to the hanging card.").

2. Validity of the '345 patent

■ Since the PTO has issued the '345 patent, that patent is presumptively valid under 35 U.S.C. § 282, unless Opti–Ray can sustain its heavy burden of demonstrating, by clear and convincing evidence, that the '345 patent is invalid or unenforceable. *American Hoist & Derrick Co. v. Sowa & Sons,* 725 F.2d 1350, 1358–60 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). The presumption of patent validity is even greater if all of the prior art references were disclosed to the patent examiner in the patent application. *Id.* at 1359. In this case, the Seaver and Pacelli patents, the 1975, 1976, and 1977 Cool Ray catalogs and the 1980 Cool Ray Pricing Sheets were all disclosed to the patent examiner, Application 606179 at 64, 122, 124, 126–28, thereby affording the '345 patent an even stronger presumption of validity.[5]

A. *Anticipation*

■ Opti–Ray argues that the '345 patent is invalid under 35 U.S.C. § 102 because it was anticipated by the prior art. Anticipa-

tion is "the disclosure in the prior art of a thing substantially identical with the claimed invention." *Walker on Patents* § 26:3 (3d ed. 1988). The defense of anticipation is only invoked if the alleged infringer can demonstrate that a single prior art reference discloses each and every element that is expressly or inherently found in the claimed invention. *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.,* 976 F.2d 1559, 1565 (Fed.Cir.1992); *Scripps Clinic & Research Found. v. Genentech, Inc.,* 927 F.2d 1565, 1576 (Fed.Cir.1991); *Hybritech, Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1379 (Fed.Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987); *RCA Corp. v. Applied Digital Data Sys., Inc.,* 730 F.2d 1440, 1444 (Fed.Cir. 1984). Anticipation is a question of fact. *Scripps Clinic,* 927 F.2d at 1576.

■ Opti–Ray has not met its burden of demonstrating, by clear and convincing evidence, that any single prior art reference disclosed the elements of the '345 patent to render Al–Site's patented invention unpatentable. Opti–Ray relies on the Pacelli patent in support of its anticipation defense. Opti–Ray offered the expert testimony of Chovanes for the proposition that the Pacelli patent contained all of the elements of the '345 patent and that it anticipated the '345 patent to those skilled in the art. Tr. 311–315.

■ This expert testimony does not support Opti–Ray's anticipation defense because it is inappropriate for the fact-finder to go beyond the features of a prior art reference in order to find that that reference anticipated the patented invention. *Scripps Clinic,* 927 F.2d at 1576. The Pacelli patent clearly does not contain all of the elements of the '345 patent. First, the Pacelli patent does not depict a cantilever to be used for

5. Opti–Ray contends that the patent examiner neither had before him the physical models of the Cool Ray hang tags, DX16, DX18 and DX80, nor the physical model of the Pacelli patent, DX53. However, this does not lessen the presumption of the validity of the '345 patent because Opti–Ray "has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examin-

ers who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents." *American Hoist,* 725 F.2d at 1359. Consequently, this Court does not consider the physical models to be any more enlightening than the items pictured and described in the Cool Ray Catalogs or in the Pacelli patent.

multiple stacking of pairs of sunglasses. Tr. 104–07 (testimony of Dr. Rosen); Tr. 332–34 (Chovanes concedes on cross-examination that the Pacelli patent does not clearly depict stacking multiple pairs along a single cantilever).[6] Second, the Pacelli patent does not contain a loop to secure the hanger card to a sunglasses frame because the plastic sheets disclosed in the Pacelli patent completely surround the sunglasses, enveloping the two lenses and the sunglasses frame. This is totally distinct from the means-for-securing a hanger card to a portion of an eyeglass frame as described in claims 1 and 2 of the '345 patent because those claims specifically exclude lenses from the definition of an eyeglass frame. Tr. 94, 96, 113.

### B. *Obviousness*

■■■■■ When the anticipation defense is not available, the patent may still be found to be invalid under 35 U.S.C. § 103 if a defendant can show that the patent claim was "obvious" in light of the prior art references as a whole. *Walker on Patents* § 26:5 (3d ed. 1988). Obviousness is a legal conclusion based on four factual inquiries: (1) the scope and content of the prior art; (2) the differences between the prior art and the claimed invention; (3) the level of ordinary skill when the invention was made; and (4) any other objective considerations including evidence of commercial success, of copying, and of a

long-felt need in the industry. *Continental Can Company USA, Inc. v. Monsanto Co.,* 948 F.2d 1264, 1270, 1273 (Fed.Cir.1991) (citing *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966)); *Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1564, 1566 (Fed.Cir.1987), *cert. denied,* 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987). The decision-maker is not to apply hindsight, but must analyze obviousness from the viewpoint of a reasonable person skilled in the art prior to the disclosure of the patented invention, *Panduit,* 810 F.2d at 1566, and the statutory presumption of 35 U.S.C. § 282 makes the patented invention presumptively non-obvious unless the challenger can demonstrate that is obvious in light of the prior art, *id.* at 1570.

■■■■ Opti–Ray has failed to meet its burden. Opti–Ray offered the expert testimony of Eugene Chovanes and William Plumb who both asserted at trial that the '345 patent was obvious in light of the prior art. Tr. 315–317 (Chovanes); Tr. 256–61 (Plumb). These expert witnesses pointed to the individual elements contained in the Pacelli and Seaver patents and in the Cool Ray catalogs and Cool Ray physical specimens as evidence that the '345 patent was invalid as obvious. However, this Court holds that the prior art of record does not render Al–Site's patented hanger card obvious.[7] First, there is nothing

---

6. Opti–Ray's counsel argued that the Pacelli patent inherently contained a reference to a cantilever as it was designed to allow sunglasses to be displayed in supermarkets. Tr. 104–108. This Court is convinced, however, that an ordinary person skilled in the art would not have recognized that the sunglasses depicted in the Pacelli patent might be stacked along a cantilever, rather than simply hung from a hook on a supermarket display case. *See, e.g., Continental Can Company USA, Inc. v. Monsanto Co.,* 948 F.2d 1264, 1268 (Fed.Cir.1991) (the asserted inherent characteristic must be necessarily present in the structure described in the prior art reference and that it would be recognized by persons of ordinary skill) (citations omitted).

7. This Court finds that sunglasses with temples and clip-on sunglasses without temples are analogous art. Determining whether prior art is analogous is a factual question. *Wang Lab., Inc. v. Toshiba Corp.,* 993 F.2d 858, 864 (Fed.Cir. 1993) (citing *Panduit Corp.,* 810 F.2d at 1568 n. 9), and the courts generally consider two criteria:

(1) whether the reference is from the same field of endeavor as the inventor, regardless of the problem addressed, and (2) if the reference is not from the same field of endeavor, whether it is reasonably pertinent to solving the problem facing the inventor. *Wang,* 993 F.2d at 864 (citing *In re Clay,* 966 F.2d 656, 658–59 (Fed.Cir.1992)). This Court has no hesitation concluding that methods of displaying sunglasses, with or without temples, is from the same field of endeavor as that of the inventor of the '345 patent relating to the method of displaying glasses. It is obvious that displaying sunglasses with temples is the equivalent of displaying sunglasses with temples notwithstanding that the inventor of a display system for eyeglasses must enable the viewer to test the magnification power of clear lenses, which is not necessary in a corresponding display case for sunglasses. In fact, Al–Site has claimed that the means used by Opti–Ray for displaying Barbie sunglasses which it manufactured under a license from Mattel, Inc., DX99, infringed the '345 patent. Tr. 229–30; DX97, DX98. It is equally clear that the display meth-

in the prior art to suggest to a person ordinarily skilled in the art to combine those elements. *Panduit,* 810 F.2d at 1568; *see also id.* at 1575 & n. 30 ("Virtually all inventions are necessarily combinations of old elements."). Second, the prior art existed for many years and yet those skilled in the art never created a hanger mechanism comparable to Al–Site's patented invention. *See id.* at 1577 (fact that skilled workers did not create patented invention despite existence of elements in the prior art is evidence of nonobviousness). For example, Seaver had access to the Cool Ray tags attached to the clip-on sunglasses, yet he never added a cantilever to his patented tag attached to eyeglasses with temples. Tr. 339–41 (Chovanes testifying on cross-examination).

Moreover, Dr. Michael Rosen, plaintiff's expert, testified that the patented hanger card was not obvious in light of the relevant prior art, Tr. 76–78, and this Court finds his testimony credible and compelling. First, the 1975 and 1976 Cool Ray catalogs, PX15a, PX15b, PX16, DX8, DX9 and DX10, do not render the '345 patent obvious because they depict an eyeglass display in which the temples of a pair of glasses are placed through holes cut into the display case and pairs of clip-on sunglasses are stored in plastic pouches stored on a cantilever. Tr. 60–64. Similarly, the 1977 Cool Ray catalog misdirected those skilled in the art from employing a hanger tag which would support the pair of eyeglasses along a cantilever because the display systems depicted in that catalog demonstrate that pairs of eyeglasses may be displayed by placing eyeglass temples through holes cut into a display case and that clip-on sunglasses may be displayed on a cantilever by placing the nose bridge of the clip-on sunglasses above the cantilever. The 1977 Cool Ray catalog, however, does not indicate that the Cool Ray tag may support the clip-on sunglasses on the cantilever. Tr. 69–70. In addition, since the Cool Ray tag hung from the nose bridge, it blocked the

view of prospective customers who would try on the clip-ons.

Similarly, the Seaver patent is totally different from the instant invention. It discloses that a pilfer-resistant tag may be attached to a pair of eyeglasses, but it does not disclose that multiple pairs of glasses may be displayed on a cantilever nor does it indicate that a pair of eyeglasses may hang from or hang below the pilfer-resistant tag.

Perhaps the most relevant prior art is the 1980 Cool Ray pricing sheet, DX14, DX15, DX48, PX19a, PX19b (all five exhibits are copies of the same pricing sheet), which depicts multiple pairs of Cool Ray clip-on sunglasses (without temples) stored along a cantilever. In the bottom right-hand display case pictured on that sheet, it appears as if the aperture in a Cool Ray tag attached to the clip-on sunglasses is positioned above the cantilever. Hallerman Deposition, dated December 23, 1991 at 111–112, 117–118, 124–25); Tr. 108, 111–12 (testimony of Dr. Rosen on cross-examination). But the 1980 pricing sheet does not indicate that the hanger tag would be used to suspend the clip-on sunglasses from a cantilever in a horizontal position. That tag is meant to contain product information and to reduce pilferage. It was never intended to support the clip-ons on the display case as is clearly shown by the fact that the Cool Ray clip-ons were universally supported by the nose bridge, rather than the tag. Accordingly, the elements contained in the Cool Ray prior art combined with the Pacelli patent (as discussed above with respect to Opti–Ray's anticipation defense) do not render claims 1 and 2 of the '345 patent obvious.

Finally, in determining whether or not a patented invention was obvious in light of the prior art as a whole, the decision-maker may consider such objective factors as success in the marketplace, copying of the invention by others and whether the invention solved a long-standing industry problem. *Continental Can,* 948 F.2d at 1273. "Such objective indicia as commercial success, or filling an

---

ods for clip-on sunglasses (without temples) is in the same field of endeavor as evidenced by the fact that some of the display cases in the Cool Ray catalogs portray systems for displaying sunglasses with temples and clip-ons without temples side-by-side. Accordingly, this Court finds that design methods for displaying sunglasses and clip-on sunglasses are analogous art to be used in determining whether the '345 patent was obvious in light of the prior art.

existing need, illuminate the technological and commercial environment of the inventor, and aid in understanding the state of the art at the time the invention was made." *Id.* In this case, Al–Site convincingly demonstrated at trial that these secondary, objective considerations weigh in favor of non-obviousness.

First, it is clear to this Court that a portion of Al–Site's success in the marketplace is attributable to the '345 patent. Tr. 151 (testimony of Morton Nyman, Al–Site's President); *see also* Tr. 336–37 (Chovanes concedes on cross-examination that some of Al–Site's commercial success derives from the patented hanger card). Commercial success evidence is filed under seal. Tr. 151–53. Notwithstanding that Opti–Ray seeks to attribute the growth in the reading glasses market to the increasing number of Americans who are ages forty and older and require glasses for magnification of text and to the fact that all fifty states now allow over-the-counter sales of reading glasses, Tr. 162–66; DX82, DX83, DX85, DX86, DX87, DX88 (newspaper clippings), "[i]t is not necessary, however, that the patented invention be solely responsible for the commercial success, in order for this factor to be given weight appropriate to the evidence, along with other pertinent factors." *Continental Can*, 948 F.2d at 1273. Accordingly, the commercial success evidence supports the conclusion that the '345 patent was not obvious in light of the prior art.

Furthermore, Morton Nyman testified that the non-prescription reading glasses market was plagued for ten to fifteen years with the problem of developing a display method which would enable retailers to sell multiple pairs of reading glasses without replenishing stock. Tr. 142–46 (testimony of Morton Nyman); Tr. 338 (testimony of Eugene Chovanes on cross-examination); Hallerman Deposition at 101–04 (Al–Site's patented hanger card was "a revolutionary new concept" in the reading glasses industry). The '345 patent solved this long-standing problem in the industry. Tr. 147–50. Opti–Ray attempted to challenge both the commercial success of the '345 patent and whether it solved the problems endemic to the reading glasses market by noting that Walgreens, a major drugstore chain, decided to discontinue carrying Al–Site's Magnivision line and chose to sell a competitor's product instead. Tr. 342–43 (testimony of Eugene Chovanes). However, this Court finds completely credible Morton Nyman's explanation that Walgreens decided to stop purchasing reading glasses from Al–Site because the competitor's product was cheaper. Tr. 348–49.

This Court also finds that the patented hanger card was not obvious in light of the prior art because Opti–Ray's design staff copied the version depicted in Al–Site's earlier '532 patent. At trial, Jimmy Vianu, Vice President of Manufacturing for Opti–Ray, was called as an adverse witness by Al–Site. Vianu conceded that he possessed copies of Al–Site's patented hanger card while designing Opti–Ray's version. His testimony was contradictory and flawed. He initially testified that he did not design Opti–Ray's hanger card, but merely designed the plastic injection molds to manufacture that hanger card. Tr. 176. He then admitted to having used Al–Site's hanger card as a reference in designing the Opti–Ray hanger card. Tr. 176–78; *see* PX25 (a group of hanger cards and labels which Vianu produced in response to a subpoena in this action). This Court is similarly unpersuaded by the testimony of Paul Peckman, a Senior Vice President of Opti–Ray, who testified that he saw a few samples of Al–Site hanger cards—"less than five"—at Opti–Ray's corporate headquarters, Tr. 236, and could not recall whether he personally purchased any samples of Al–Site's patented hanger card before Opti–Ray began designing its hanger card. Tr. 236.

In sum, upon considering the evidence of the subjective and objective criteria to be used in ascertaining whether a patented invention was obvious in light of the prior art, this Court is driven to conclude that the '345 patent is valid.

### C. *Indefiniteness*

Opti–Ray argues that the '345 patent is invalid for indefiniteness under 35 U.S.C. § 112 because the specification in the '345 patent provides that the means for securing is wrapped loosely around the nose bridge in

order to suspend the pair of eyeglasses from a cantilever in a horizontal orientation. This argument is rejected as frivolous. First, this Court has already determined that the means for securing element need not necessarily wrap around the nose bridge. It can be attached to any portion of the eyeglass frame which is specifically defined in claim 1 and dependent claim 2 as comprising two rims, a nose bridge and two eyeglass temples. Furthermore, one skilled in the art would easily recognize that the specification in the '345 patent merely seeks to disclose that, while the hanger card is made from a rigid, inflexible material, the means for securing is to be constructed in a way which allows it to be wrapped around the nose bridge. In fact, the specification later states that the rivet or other fastener is used to close the means for securing element. At that point, the hanger card extension can certainly be tightened in order to support the eyeglasses in a horizontal orientation. Because the language of the '345 patent is sufficiently definite as to enable a person skilled in the art to use the invention disclosed, the '345 patent is valid. *See, e.g., Wang Lab., Inc. v. Toshiba Corp.,* 993 F.2d 858, 865–66 (Fed.Cir.1993); *In re Hayes Microcomputer Prods., Inc. Patent Litig.,* 982 F.2d 1527, 1533–34 (Fed.Cir.1992) (disclosure in specification is aimed at one skilled in the art and the definiteness of that disclosure varies with the complexity or simplicity of the invention disclosed).

### D. *Inequitable conduct*

Opti–Ray argues that the '345 patent is unenforceable because Al–Site allegedly defrauded the PTO to obtain the '532 patent which is the parent of the '345 patent. In support of this claim, Opti–Ray has designated portions of the transcripts of the depositions of Gordon Hallerman and Jerome Berliner into evidence relating to the inequitable conduct issue. *See* Tr. 344, 346. This Court need not address this argument once again as it has already determined that Al–Site was not guilty of inequitable conduct before the PTO in prosecuting the '532 and '345 patents. *See* Memorandum and Order of this Court, dated May 28, 1993, at 15–21. The findings of fact and conclusions of law set forth in that prior memorandum and order are adopted as if fully set forth in this opinion.

### CONCLUSION

Based on the foregoing findings of fact and conclusions of law, this Court holds that the '345 patent is valid and enforceable and that Opti–Ray is liable for patent infringement. The parties shall contact the Court to schedule a trial addressed both to the issue of damages and whether Opti–Ray's infringement was willful.

SO ORDERED.