MEMORANDUM RE: REMAINING ISSUES

PONSOR, District Judge.

I. INTRODUCTION AND BACKGROUND

On December 16, 1991, the plaintiff, Gentry Gallery, Inc. (“Gentry”) filed suit against The Berkline Corporation (“Berkline”) for infringement of U.S. Patent No. 5,064,244 (“the ’244 patent”). This patent covered a one-armed sectional sofa, with a console positioned between two reclining chairs.
Berkline filed an answer and counterclaim alleging non-infringement, invalidity of the patent (due to prior availability and obviousness), and inequitable conduct. Following discovery, Berkline filed three motions for summary judgment. These motions argued as a matter of law that Berkline’s product did not infringe the ’244 patent, that the patent was invalid due to inequitable conduct by Gentry in obtaining the patent, and that an offer to sell a similar invention by another inventor in 1989 constituted a statutory bar to the plaintiffs patent.
On April 13,1993 this judge, then a Magistrate Judge, issued a Report and Recommendation to the effect that Berkline’s motion for summary judgment on the issue of non-infringement should be allowed. In essence the court found that a “fixed console” between the two reclining chairs was an essential feature of the ’244 patent and that Berk-line’s product did not include any such fixed console. Having apparently disposed of the case on the issue of infringement, the court declined to address the issue of inequitable conduct and recommended that the motion based on that ground be denied. With regard to the question of the so-called “on sale bar” the court found material, disputed issues of fact and recommended that the summary judgment motion offered on that ground be denied as well.
On January 20, 1994 Judge Freedman adopted this court’s Report and Recommendation in toto, allowing Berkline’s motion based on non-infringement and denying the others. This, ordinarily, would have been the end of the case.
*100 Berkline, however, argued strenuously that, under law emanating from the Federal Circuit, this court was obliged, even in the face of Berkline’s entitlement to judgment (based on its success on the issue of non-infringement), to address all issues raised by its counterclaims. Gentry disagreed, but this court eventually decided that the more prudent course was to address all the issues, as Berkline demanded. On November 10, 1994, the case having been transferred to this docket following my appointment to the district court, an order issued setting a schedule for further proceedings on Berkline’s remaining counterclaims.
Trial commenced on September 5 and concluded on September 11, 1995. After submission of post-trial briefs the court heard closing arguments on November 9, 1995. At that time the court ruled in favor of Gentry from the bench on two of the four remaining issues: the on-sale bar and the claim of inequitable conduct.
The court concluded, first, that no credible evidence supported Berkline’s claim of a pri- or offer of sale. The testimony of Berkline’s witness, Durling, was rejected on the ground that the court’s observations of the witness led to the conviction, or at least strong suspicion, that his testimony was animated by bias against Gentry and some of its employees, and lacked credibility in other respects.
Second, the court found the testimony of Gentry’s witness, Greenfield, to be consistent and convincing on the question of inequitable conduct. Based on this testimony and also on the overall weakness of Berkline’s evidence concerning inequitable conduct, the court concluded that Berkline had failed to carry its burden on this portion of its counterclaim. On these two issues the court reserved the right to refine its reasoning in a written memorandum, if on reflection the court found this to be necessary.
Two issues remained following oral argument. The court took under advisement the question whether the ’244 patent is invalid under 35 U.S.C. § 103 because it constitutes an obvious step forward from the prior art, and the question whether certain claims in the patent are invalid under 35 U.S.C. § 112 for lack of an adequate written description.
The discussion below will unfold in three sections: first, a few additional remarks regarding the questions of the on-sale bar and the plaintiff’s alleged inequitable conduct; second, an analysis of the obviousness issue, and finally the court’s decision with regard to alleged defects in the written description in light of § 112. For the reasons set forth below the court will be finding in favor of the plaintiff on these issues.

II. DISCUSSION

A. The On-Sale Bar and the Issue of Inequitable Conduct
A few words may be added to the reasons set forth by the court orally last November regarding the on-sale bar. To prevail on this point, Berkline bears the burden of offering clear and convincing evidence that a drawing made by Walter Durling both constituted prior art and was offered for sale more than a year before January 3,1991, the date of the ’244 patent. Durling testified that he offered an entity called Silver Oaks a drawing containing the essence of the ’244 patent in October 1989.
Myriad problems render this testimony not credible. First, the drawing itself, Exhibit B-20, does not even convincingly depict a reeliner, let alone an inside recliner. Second, no corroboration exists as to when the drawing was conveyed to Silver Oaks. No cover letter confirms this essential point, and Dur-ling was apparently in contact with Silver Oaks before and after the crucial date. Third, the drawing makes no indication of any control mechanism to activate the reeliner, a knotty design issue that Gentry spent many months solving. Coupling these problems with Durling’s transparent hostility to Gentry and its principals makes decision on this point simple. Berkline has not carried its substantial burden' regarding the on-sale bar.
Less need be added to the court’s oral remarks regarding inequitable conduct. As the court noted, the core of Berkline’s ease on this point was Gentry’s failure, through its counsel Greenfield, to include a photograph of a Benchcraft sofa in its Peti *101 tion to Make Special, and its failure to disclose the co-pendency of the Durling patent application to the patent examiner. Berkline bears the burden of demonstrating that the prior art, or pending patent application, was material, that Greenfield knew of it and that he intentionally failed to disclose it in an effort to mislead the patent office — all by clear and convincing evidence. The evidence at trial was not even close. Assuming the Benehcraft photo was material, no persuasive evidence suggests that either Attorney Greenfield or Gentry’s principal, Sproule, knew of its existence at the relevant time. Moreover, Greenfield and Sproule’s candor during their interview in the patent office in June of 1991 renders incredible any suggestion of a deliberate intent to mislead. With regard to the pending Durling patent application, the evidence is weak that it was even material. Taking all this with the strong and convincing testimony of Attorney Greenfield regarding his efforts to insure that all appropriate material was submitted, and considering all Berkline’s arguments on this point, the court can only reach one conclusion: Berkline failed to carry its burden regarding inequitable conduct.
B. Obviousness
Berkline’s counterclaim for patent invalidity based on obviousness constitutes by far the closest and most difficult issue of this ease. This stubborn question has necessitated the court’s intermittent, intense consideration over an unusually protracted advisement period. On the day of oral argument the court took the bench with the inclination, based on the evidence and written submissions up to that time, to find for Gentry on this point, but was forced to reconsider due to the force of Berkline counsel’s well-crafted argument.
Now, having examined the most helpful cases and re-read relevant portions of the trial transcript, the court has concluded that it must return to its original bent. Many factors support this decision, but two stand out: the strong, credible testimony of Gentry’s witness Metts,.and the significant burden of proof that Berkline carries on this issue.
The starting point of the analysis is clear: a patent is presumed valid. 35 U.S.C. § 282. It can only be overturned by clear and convincing proof presented by a challenger.
One ground for invalidity is obviousness. The standard for proving obviousness is set down with deceptive simplicity in the statute. The ’244 patent may be found to be invalid,
... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art.
35 U.S.C. § 103.
In evaluating a claim of obviousness the court should consider (1) the scope and content of the prior art, (2) the differences between the prior art and the subject matter at issue, and (3) the level of ordinary skill in the pertinent art. Other factors to be considered include the commercial success of the invention, any long-felt but unsolved needs, and prior failures to invent. Ryko Mfg. Co. v. Nu-Star, Inc., 950 F.2d 714, 716 (Fed.Cir.1991).
To fairly weigh a claim of obviousness, the court must, to some extent, place itself in a time machine; it must look at the invention with the eyes of an ordinary artisan living at the time the invention was made. This viewpoint is essential because many inventions, perhaps most, are obvious in hindsight and seem simple. As the Court of Appeals has said, “Simplicity is not inimical to patentability.” In re Oetiker, 977 F.2d 1443, 1447 (Fed.Cir.1992).
The Federal Circuit has pointed out, the “[ajnalysis begins with a key legal question— what is the invention claimed? ” Panduit Corp. v. Dennison Mfg. Co., 810 F.2d 1561, 1567 (Fed.Cir.1987). (Emphasis in original). To understand this point, some background is helpful.
The invention embodied in the ’244 patent was bom in response to a reality as homely as the human heart: two people watching television like to sit next to each other. This predilection became complicated *102 as more and more Americans discovered that they also liked to watch television from a big comfortable chair with a mechanism that allowed it to tilt back — a recliner. Companionship and comfort could be achieved by the purchase of two recliners placed side-by-side and facing the TV, but this arrangement, in many people’s eyes, made the living room look ugly and encumbered.
This dilemma brought the recliner into contact with another home furnishing feature, the sectional sofa. Sofas, loveseats, chairs, and the like can be sold as “free standing” or “sectional.” A typical freestanding sofa stands by itself and has arms on eaeh end. A sectional sofa is meant to be one of several components, usually organized into an “L” shape, with a “wedge” piece, most often a chair but sometimes a table, at the junction. A sectional sofa will have only one arm, attached on the outside, since the inside end of the sofa abuts the wedge to make one half of the L-shaped design.
Now, the sectional arrangement can have components of various types: for example, a two- or three-cushion classic sofa, a chair, a fold-out bed, or a recliner. Prior to the ’244 patent it was not uncommon for a single recliner to be incorporated into a sectional set-up, or even two recliners, so long as the two recliners were at the opposite ends of the “L” — that is, on different sides of the wedge, at right angles to each other. Before the Gentry invention, however, no one had ever manufactured a one-armed sectional sofa containing two recliners to be arranged on the same side of the wedge — that is, in a manner that permitted two people to sit next to each other in the recliners and watch television facing in the same direction. This fact is undisputed.
This change, which has been extraordinarily popular, certainly seems simple. Any graduate of a high school art class could design the essentials with a piece of paper and pencil in ten minutes. But no one did. In fact, Berkline itself, according to its chief executive, probably considered and rejected a similar idea. Moreover, as will be seen below, the engineering problems associated with the change — particularly arising from the fact that one of the side-by-side recliners (since it abutted the wedge) could have no arms — gave Gentry fits for many months before the problem was solved.
To return to the threshold question, then, the claim here — as formally set forth in Claims 1 and 16, the broadest claims of the ’244 patent — covers a sectional sofa in which a pair of reclining seats on the same side of the wedge is separated by a fixed console in a unitary structure with a pair of control mechanisms for the seats.
Before turning to the next question, prior art, some history of how the invention came about is appropriate. In the late 1980s James Sproule had the idea to place two recliners together at one end of a sectional sofa arrangement. He discussed the idea with colleagues at Gentry and was told flatly that the idea would not work. Since the controls for recliners were almost universally on the arms or side of recliners at that time, it was not clear where the controls for the armless “inside” recliner, the one pressing up against the wedge, would go. It was also difficult to conceive how the stability of this recliner would be safely and aesthetically maintained without any arms. In 1989 Sproule came up with the idea of a console, to be placed between the side-by-side recliners to house the control mechanism and, as a bonus, to provide a place to put drinks and snacks. Sproule hired an independent designer to draw up the idea, and began working with Billy Metts, Gentry’s Vice President, on actually building a prototype.
Berkline -witnesses testified that removing an arm from a recliner so it could be shoved up against a wedge was simplicity itself in 1989, despite the fact that no one did it. Metts’ testimony destroyed this notion. With decades of experience designing and actually constructing furniture, he was a highly credible witness. As he stated, “It’s easy to draw it on paper, but it’s very hard to make it work a lot of times.” Trans.Vol. V. at 23. With all his experience he had never seen an inside recliner in a sectional arrangement until he helped build it. Id., at 28. He described the “many, many problems of trying to put the recliner over on the inside.” Id., at 29. These included the design of the control mechanism, the stability of the chair *103 frame, and the location of the control. Id. at 30-31. He described the process as follows:
... most [recliners] have an arm on the outside where you reach down and trip it. On the inside recliner, we didn’t have a piece like that.
We first thought of putting it over on the side toward the wedge but when you pushed the wedge up, it pushed the button and released; it just pushes the piece of furniture up.
We put it under the cushion, trying to work it underneath the cushion on that side, and when you sit down on the cushion, it released the button which became very dangerous. And later we went back to the console, put the console in and putting a button on the console, and it’s a long story I guess, sir_”
Id., at 31-32.
Metts described himself as being in “utter shock” at Durling’s report (which turned out to be false) that he had already obtained a patent on their design. Id., at 38. At a meeting Metts pointed out to Durling that his design did not even purport to be more than a free standing sofa with arms on each end. Durling then apparently replied that he could simply take an arm off one end of the stand alone sofa to make it a sectional. Metts’ reply was telling: “He said, well, it’s very easy to take it off, take an arm off and I told him I wish it was. I worked for months trying to get it done.” Id., at 40.
Sproule and Metts got a prototype working by April 1990 but were unable to get it upholstered and ready for the national show that month. In October of 1990 for the first time Gentry publicly exhibited a sectional arrangement with side-by-side recliners separated by a console, on the same side of a wedge, at the High Point National Show. It caused a sensation.
While it is true that the overall market for reclining furniture has increased, the most credible evidence is that side-by-side sectional recliners have been a huge commercial success. The arrangement has become one of the industry’s standard bearers. In 1989 Gentry had total sales of $17 million; in 1994 Gentry sold $37.5 million of the patented product alone.
What, then, was the prior art as of October 1990?
The parties agree as to at least four categories of prior art: free standing sofas with recliners at each end (so called “double-reclining” stand alone sofas); one-armed recliners that could abut a table; airplane-type side-by-side recliners separated by a seat with a dropdown tray (the Brennan patent), and the “Talley” patent depicting an armless recliner. Berkline also presses two additional points on the issue of prior art: a prototype by Benehcraft of what might have been side-by-side recliners, and the supposed industry practice of taking an arm off a reeliner to make it part of a sectional arrangement. The court has not considered the drawings of Berkline’s witness Durling as prior art because his statements are not credible in themselves and are uncorroborated.
Any claim that the Benehcraft piece even existed (as one Berkline witness testified) is highly dubious, given the lack of any documentary corroboration. Moreover, Metts, who was employed as Benehcraft’s product development director in 1985 when the product was alleged to have appeared, testified credibly that the product testified to was no more than a stand alone sofa with side by side recliners. This testimony puts an end to any independent claim of prior art through Benehcraft.
The contention regarding a supposedly prevalent industry practice of taking the arm off a recliner to make it part of a sectional is similarly unsupported. Aside from Durling’s testimony, which the court rejects, the only credible evidence was that the arms of stationery sofas were often removed to put them with sectional arrangements. As Metts testified, this was not done with recliners due to the difficulties described above.
To repeat, stationery sofas suffer no special stability problems because they do not move; they need no controls to activate any reclining mechanism. Removing an arm from a stationery sofa is an entirely different *104 and much easier job than removing an arm from a recliner.
The crucial distinction between stand-alone sofas and sectionals rebuts Berkline’s argument that the existence of side-by-side recliners in stationery sofas renders the patented invention obvious. A crucial aspect of the ’244 patent is the concept of a recliner with no arms, the so-called “inside” recliner, that can be positioned snugly against a wedge. With a side-by-side stand-alone sofa, each recliner retains an outer arm to provide stability and to create a location for the controls. The same can be said of the Brennan patent, involving the airplane-type seats, which are dramatically different from the patented invention in any case.
Berkline’s strongest argument centers on the Talley patent, which predates the ’244 patent and depicts an armless recliner, with the control mechanism in the form of a sliding release button concealed under the seat cushion on the side. The difficulty with this recliner, and the flaw in Berkline’s argument, is that the Talley recliner would be completely inappropriate for use in a sectional arrangement. Pressed firmly against the wedge, the area at the side under the seat cushion, where the Talley patent put the sliding button, would be inaccessible, rendering it difficult or impossible for a person seated in it to operate the reclining mechanism.
Turning from the prior art to the next question — the ordinary level of skill in the art — the court finds no disagreement. The relevant level of skill involves minimal education coupled with experience in the furniture industry and minimal mechanical aptitude.
The next question — the differences between the prior art and the claims — has been addressed implicitly above. None of the pri- or art depicts a one-armed sofa with two recliners separated by a console, with the controls located so they can be easily operated by the seated person, designed to be on the same side of the wedge in a sectional arrangement. Of course, as Berkline correctly notes, it is not necessary for a patented invention to be exactly duplicated in order to be obvious. The doctrine of obviousness would be meaningless in that event. Here, however, the precursors, while close, did not make the invention “obvious” to the ordinary person skilled in the art at the time. Considerable vision was required to imagine the invention, and mechanical skill and persistence were needed to bring it into the world.
The objective evidence, the final, optional factor to be considered, strongly supports the conclusion of non-obviousness.
With regard to commercial success, for example, while Berkline tends to poo-poo the invention’s popularity, the more credible evidence is that the side-by-side sectional recliners have been a tremendous hit with consumers. Other manufacturers, including Berkline, have moved quickly to bring out products incorporating the same features. This commercial success and immediate copying emerges as particularly sharp evidence of non-obviousness when contrasted with the fact that Berkline’s chief executive officer, Cordover, testified at trial that his staff, during a brainstorming session in 1988 (two years before the appearance of Gentry’s product), must have thought of Gentry’s idea but nevertheless failed to develop it. Accepting this testimony, it was certainly not obvious to Berkline itself, prior to the invention, that this product — now in hindsight known to be so successful — was feasible and marketable as of 1988. The most persuasive evidence is that prior to 1990 a substantial need was felt by the public but unsatisfied by the existing range of products and that Gentry’s imagination and technical ingenuity created a new invention that spoke to that appetite.
This discussion of obviousness is not meant to suggest that Berkline’s ease was in any way laughable. Particularly in view of the Talley patent Berkline had a strong case, strongly presented. But all the court’s comments must be viewed against three elements of the legal background that, in the end, have made the decision inevitable. First, as noted at the outset, patents are presumed to be valid. Second, the patent was upheld by the Patent Office after the PTO was informed of the existence of this litigation and was given everything that Berkline has submitted in *105 this case, including the prior art. Third, Berkline bears a heavy burden; it is not sufficient to show simply that it is more likely true than not true that the invention was obvious. The evidence must be clear and convincing. ■ Viewed as whole, it was not.
C. Failure to Comply with 35 U.S.C. § 112
While the obviousness issue is heavily fact-laden, this issue is almost purely legal. Again, while BerHine’s argument is color-able, Gentry has the stronger position.
A patent applicant is required to make a detailed description of his invention, called a “specification.” This specification must include at least one “embodiment” of the invention, but it need not specify all possible embodiments. Along with the specification the applicant must include at least one, or possibly more, written “claims;” a claim particularizes the subject matter which the applicant regards as his invention.
Thus, 35 U.S.C. § 112 states:
The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.
The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.
It cannot be disputed that Gentry’s specification of the ’244 patent describes a structure in which the control means are mounted on a console positioned between the two re-diners. As Berkline points out, no other location is described for the control means in the specification that Gentry originally filed and no change was ever made to that specification either in the words or drawings during prosecution.
Due to amendments to the scope of the claims during the prosecution, however, only nine of the claims now restrict the location of the control means to the console. The remaining issued claims (1-8, 11, and 16-18) have been broadened to allow for the control means to be located other than on the console, despite the lack of explicit support for any alternate location in the unamended specification. This change was apparently effected in response to the emergence of competitive products with the controls in other locations.
Based on the inconsistency between the specification and the language in the more broadly worded claims, Berkline argues that the only invention disclosed with reasonable clarity by the written description in the ’244 patent was a device with the controls on a central console. The broader claims, purporting to give Gentry rights in products with the control elsewhere, are therefore invalid. In addition to the plain words of the specification, Berkline points to the testimony of Billie Metts and to the correspondence of Gentry’s attorney as confirming Gentry’s own contemporaneous view that the invention necessarily included the controls on the console.
In making this argument Berkline is not suggesting that every embodiment of an invention must be detañed in the specification. It does argue that a claim can only cover an invention supported by the written description. Gentry responds that its claim is “broad” but not unsupported by the specification.
The crux of the parties’ argument is well exemplified by a recent Federal Circuit case, Ethicon Endo-Surgery, Inc. v. United States Surgical Corp., 93 F.3d 1572 (Fed.Cir.1996). The case was submitted by Gentry’s counsel after argument, and commented on by counsel for both parties.
Ethicon involved a patent for a surgical stapler with a lockout device that prevented the stapler being used when its stapler cartridge was empty — a practice that might present dangers to the patient. One of the issues on appeal was whether the lock-out mechanism had to be located on the cartridge, or whether the lockout could be located elsewhere. The specification put the lock *106 out on the cartridge only, but one of the claims covered another possible location. The trial judge found the broader claim invalid under § 112. In reversing, the Court of Appeals observed that “... the district court confused a claim not supported by the specification, which is not allowable, with a broad claim, which is.” Id., at 1582, n. 7.
The question, then, is simple. Are the broader claims in the ’244 patent in its present form simply embodiments of the basic invention as described in the specification, or do they constitute a divagation unsupported by the specification?
The court concludes that the claims are “broad” but not unsupported. The central quandary confronted by Sproule, Metts and the other Gentry employees was how to design an “inside” recliner — one that had no arms and that was pressed up against the wedge. The dilemma obviously eliminated both the option of putting the control on the arm, which did not exist, or down at the side under the cushion, which was inaccessible. The embodiment contained in the specification put the control on the central console. But a recliner with a control mechanism in any location that was easily accessible to a person seated in the recliner and that permitted the recliner to retain both its stability and its position directly up against the wedge was supported by the specification. The claims in the ’244 patent covering a control mechanism in other locations are broad, but not unsupported. They are therefore valid.

III. CONCLUSION

Based on the foregoing the court hereby orders entry of judgment in favor of the defendant Berkline both on Gentry’s complaint for patent infringement and on Berk-line’s counterclaim for non-infringement. The court orders entry of judgment for Gentry on all of Berkline’s other counterclaims.
A separate order will issue.